OPINION OF THE COURT
Gabrielli, J.
In the instant libel action, we are called upon to consider a number of novel and interesting questions regarding the liability of the various actors who, it is claimed, participated in their respective capacities in the republication in book form of an allegedly false and defamatory series of newspaper articles.
Between February 1 and March 4, 1973, Newsday, a widely circulated Long Island newspaper, published a series of articles entitled “The Heroin Trail” tracing the primary supply routes of the narcotics trade from its origins in Asia and Europe to its ultimate destination in the United States. The series of articles, which was primarily the product of a 13-month investigation conducted by a three-man team of Newsday reporters, received a great deal of public acclaim and was eventually awarded a Pulitzer Prize as “a distinguished example of meritorious public service by a newspaper”. Although more than 300 individuals were named in the articles as participants in the international heroin smuggling trade, there is no indication that Newsday *537 was ever called upon to respond to charges of defamation as a result of its publication of the series.
In June of 1974, the New American Library (NAL) republished “The Heroin Trail” in book form pursuant to its March 11, 1973 agreement with Newsday. Under this agreement, one Donald Forst, who had worked on the series in his capacity as a managing editor for Newsday, was “loaned” to NAL to assist that organization in its preparation of the book.
On or about April 10, 1975, following the publication of the book, plaintiff commenced the instant libel action, naming as defendants Newsday, NAL, Forst and the three investigative reporters who had authored the original series of articles. Plaintiff, a Turkish national who had been named in “The Heroin Trail” as a specialist “in smuggling by the Black Sea route”, alleged that the printed accusation against him was false and that his reputation as a legitimate businessman in his homeland had been grievously injured as a result of the defamatory statements about him.
Plaintiff’s first cause of action, which was based solely upon the original publication of the accusation in Newsday, was promptly dismissed on the ground that it was time-barred under the applicable Statute of Limitations (CPLR 215, subd 3). No appeal from this ruling was perfected, and its correctness is not disputed in the present appeal. The second and third causes of action, which were predicated exclusively upon the republication of the accusation in book form, however, were treated as timely, and, consequently, plaintiff was afforded a full opportunity to depose defendants in an effort to obtain evidence to support his claim.
Following the completion of these discovery procedures, all six named defendants moved for summary judgment, arguing that plaintiff had failed to adduce evidence sufficient to defeat their qualified privilege as journalists under the standards articulated in Chapadeau v Utica Observer Dispatch (38 NY2d 196). In support of their motion, defendants submitted a number of affidavits by those involved in the research and publication of “The Heroin Trail” detailing the elaborate procedures that had been followed *538 internally in an effort to ensure the accuracy of the story. The affidavits submitted by the three reporters indicated, in addition, that the information concerning plaintiff’s participation in the heroin smuggling industry was derived from their personal contact with several sources, including one Galip Tabernas, a retired inspector in charge of the Turkish State Narcotics Organization in northern Turkey and Istanbul, one Omer Aygun, Chief of the Homicide Squad for the Istanbul Police, and one Orhan Erbug, Director General of the Turkish National Police.[1] Finally, the three reporters also asserted in their affidavits that their participation in the production of the newspaper series had come to an end with the publication of “The Heroin Trail” in Newsday and that they had not been involved in any way in the republication of the series in book form by NAL. Accordingly, they argued, they could not be held liable for any injury to plaintiff, if such there be, arising from NAL’s separate acts in republishing the series.
Plaintiff vigorously opposed the motion for summary judgment, submitting in support of his position three affidavits by Tabernas, Aygun and Erbug, respectively, in which each denied having made any disparaging comments about plaintiff concerning his purported involvement in the international heroin trade. Indeed, all three stated that plaintiff was a well-respected Turkish businessman of excellent local repute. Relying primarily upon these affidavits, plaintiff argued that there existed a triable question of fact as to whether defendants had > acted in a “grossly irresponsible” manner in republishing the accusations against him in the 1974 NAL edition of “The Heroin Trial” and that, consequently, summary judgment should not be granted.
*539 Special Term ruled in favor of defendants and dismissed the complaint, finding that “ [t] he widespread praise accorded the publication of the original newspaper articles and the absence of any legal action after such publication is sufficient to disprove a claim of gross irresponsibility”. The Appellate Division reversed and reinstated plaintiff’s second and third causes of action against the six defendants, reasoning that the existing evidence raised sufficient doubt concerning defendants’ “good faith” in republishing the accusations to warrant a full trial of plaintiff’s allegations. For reasons that follow, we now unanimously reverse the order of the Appellate Division insofar as it reinstated the causes of action against Forst, NAL and the three Newsday reporters and hold that summary judgment in favor of each of these five defendants was properly granted at Special Term. In addition, three of the members of our court are of the opinion that the causes of action asserted against defendant Newsday also should be dismissed. Our reasons follow.
Preliminarily, we note that there is no dispute in the present appeal regarding the proper standard to be applied in determining defendants’ liability for the allegedly defamatory statements. Although plaintiff is a “private” individual, the subject matter of the articles in issue is unquestionably a matter “within the sphere of legitimate public concern” (Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199, supra). Accordingly, the statements, even if false, cannot lead to liability unless it is proven by a fair preponderance of the evidence that its publishers “acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties” (id., at p 199). As a matter of equal importance, it must be stressed that defendants may be held answerable in libel in the instant case only if their conduct is found to be “grossly irresponsible” in relation to the 1974 republication of “The Heroin Trail” in book form. Any injury which defendants may have caused plaintiff as a direct result of their participation in the original publication of the articles by Newsday is now beyond judicial remedy, *540 since plaintiff failed to institute suit on the basis of such injury within the one-year period prescribed in CPLR 215 (subd 3). Additionally, it is well established as a matter of substantive law that the five defendants who actually were responsible for the initial publication of “The Heroin Trail” in serial form cannot be held personally liable for injuries arising from its subsequent republication in book form absent a showing that they approved or participated in some other manner in the activities of the third-party republisher. This is so because the law of our State does not render the original publisher of a defamatory statement automatically liable for subsequent republications of the statement by others (Macy v New York World-Tel. Corp., 2 NY2d 416, 422; Raines v New York Press Co., 92 Hun 515; see 1 Seelman, The Law of Libel and Slander in the State of New York, par 149, p 187; 35 NY Jur, Libel and Slander, § 156, pp 66-67).
With these principles in mind, we turn our attention to the specific questions of liability presented in the instant appeal.
I
In his pleadings, plaintiff purported to assert a separate cause of action against the three Newsday reporters who authored the original version of “The Heroin Trail” on the basis of their alleged involvement in the republication of that series by NAL in book form. Upon defendants’ motion for summary judgment, however, plaintiff failed to produce any evidence whatsoever to support his allegation that the reporters “published, participated in, authored [or] permitted” the publication of the book. Notably, the motion for summary judgment was made only after plaintiff was given a full opportunity to depose defendants and to discover any additional information which defendants might possess that would tend to support his claim against the reporters.
Inasmuch as the record is barren of any concrete evidence of the reporters’ involvement in the republication of the newspaper series, we conclude that the causes of action against them must be dismissed. Even if we assume, as we must upon this motion for summary judgment (see Glick & *541 Dolleck v Tri-Pac Export Corp., 22 NY2d 439), that plaintiff’s affidavits are an accurate reflection of the facts, we could go no further on the present record than to conclude that the three reporters published the alleged defamatory statements about plaintiff in Newsday knowing that the information had not been confirmed by the purported sources, Labernas, Aygun and Erbug. Although such a conclusion might be sufficient to establish a triable issue of fact regarding the reporters’ allegedly “irresponsible” conduct with respect to the original publication of the article in question, it could not, in itself, support the continuance of a cause of action based solely upon the 1974 republication of the article.[2]
II
We further conclude that there must be a dismissal with respect to the cause of action asserted against defendant Donald Forst, the managing editor who worked with the reporters on the production of the original series and who was later “loaned” by Newsday to NAL to assist in the publication of the book. Forst, unlike the reporters, was unquestionably involved in the 1974 recasting of the newspaper series into book form and is therefore indisputably subject to a suit based upon that separate publication. Nevertheless, he may not ultimately be held liable for his individual conduct in relation to the publication of the book unless it can be shown by a fair preponderance of the evidence that he personally “acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties” (Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199, supra).
We hold that, under the circumstances of this case, the test of “gross irresponsibility” cannot be met by a bare showing that defendant Forst edited the work of three re *542 porters who, it is argued, fabricated information and cited nonexistent sources in support of their charges. As is indicated by the motion papers, Forst worked out of the New York City office of the newspaper. His role with respect to the original series of articles was primarily to receive material which had been prepared by the reporters and to make whatever editorial suggestions or corrections he deemed appropriate before returning the copy to the authors. Significantly, there is no indication on the record that Forst had any reason to question the integrity of the reporters or to suspect the veracity of the material with which he was supplied. Indeed, there is not the slightest suggestion that Forst’s own behavior was anything but responsible and in accord with accepted journalistic practices.
Absent some showing that Forst personally had reason to doubt the truthfulness of the statements in the articles, we find it difficult to understand how he could be held “grossly irresponsible” in assisting NAL to prepare the articles for republication in book form (see, also, James v Gannett Co., 40 NY2d 415, 424). Of course, we cannot base liability upon the mere fact of. Forst’s professional association with the three reporters who allegedly misrepresented their sources, since to do so would be to resurrect the kind of liability without fault that was expressly rejected in Gertz v Robert Welsh, Inc. (418 US 323). If there is to be any liability at all on the part of defendant Forst, it must be because Forst himself knowingly engaged or acquiesced in the type of misconduct which may lead to libel damages under the standard articulated in Chapadeau v Utica Observer-Dispatch (38 NY2d 196, supra).
Moreover, we decline to hold that the present existence of triable questions concerning the integrity of the reporters is, without more, sufficient to give rise to an inference of culpability on the part of their editor and to impose upon the editor the burden of demonstrating his own freedom from “guilty knowledge” concerning the accuracy of the statements alleged to be libelous by proving that he took independent steps to verify the statements. Newspapers, like any other organization, must operate through the delegation of responsibilities and chores to workers at the appropriate *543 level of the organizational hierarchy. If a newspaper is to function with a modicum of efficiency and perform its important task of carrying information to its readers, its editors must feel reasonably free to rely upon the trustworthiness and integrity of their reporters, at least in the absence of any indication that the reporters in question are not to be trusted. A rule which, absent proof to the contrary, would permit an inference against an editor to be drawn upon a simple showing that his reporters had been “grossly irresponsible” on a single occasion would indirectly impose upon editors the burden of duplicating their reporters’ work and rechecking with specificity all of their sources in order to establish a defense to libel claims arising from the potential misconduct of the reporters. Such a result would be completely unacceptable, since it would require a far higher degree of care than has previously been required in our case law (see James v Gannett Co., 40 NY2d 415, supra) and would, more seriously, operate to dampen the free exercise of the rights guaranteed by the First Amendment.
We do not believe that this conclusion imposes an insuperable or unfair burden upon plaintiffs who seek to hold the editorial and managerial staff of a newspaper personally liable for the publication of defamatory material. Where the reporters have acted irresponsibly, an editor or managerial employee might be held personally liable, for example, upon a showing by concrete proof that he knew or had reason to know that his reporter or his reporter’s sources were unreliable or subject to question. Similarly, proof that the procedures used by the newspaper in checking its stories were generally slipshod or careless could perhaps support an inference that the particular editor or manager personally “acted in a grossly irresponsible manner” in allowing a statement to be published without making further inquiries about its accuracy. Evidence of such concrete facts is readily obtainable through the normal channels of discovery, and, if such facts exist, a motion by the defendant editor for summary judgment could easily be defeated through the submission by the plaintiff of objective proof in the form of affidavits and depositions (see, also, Oakes, Proof of Actual Malice in Defamation Actions: An Unsolved Dilemma, 7 *544 Hofstra L Rev 655, 655-666). In light of the availability we can perceive no sound reason to accept bare speculations or inferences concerning an editor’s subjective awareness of his reporter’s alleged dishonesty as substitutes for specific proof of the editor’s own “grossly irresponsible” conduct.
Here, no such specific proof was offered. The claim against defendant Forst was based solely upon the charge that he had edited the work of the three reporters who allegedly falsified the statements concerning plaintiff. There was no evidence that Forst was actually aware of any wrongdoing on the part of his reporters, and, furthermore, there is not the slightest suggestion that Forst possessed information which should have alerted him to investigate the work of his reporters before approving the publication of their articles, either in the original serial version or in the subsequently issued book. Thus, as a matter of law, his conduct cannot upon this record be considered “grossly irresponsible”, and he is therefore entitled to summary judgment.
In reaching this conclusion, we have not overlooked recent hints by the Supreme Court that the issue of a defendants culpability in libel suits such as this “does not readily lend itself to summary disposition” (Hutchinson v Proximire, 443 US 111, 120, n 9; see Wolston v Reader’s Digest Assn., 443 US 157, 161, n 3; cf. Herbert v Lando, 441 US 153). We note, however, that questions concerning the sufficiency of a party’s submissions to defeat a motion for summary judgment are principally a matter of State procedural law, and the analysis which the Supreme Court may use in denying a motion for summary judment under the Federal Rules of Civil Procedure may differ substantially from the analysis that we would use under our own procedural statutes (cf. Trails West v Wolff, 32 NY2d 207, 221). Moreover, the remarks of the Supreme Court upon which plaintiff relies are not persuasive in the present context, since the language in question was addressed to those situations in which the plaintiff is required to prove “actual malice” under the standard enunciated in New York Times Co. v Sullivan (376 US 254). Under that most exacting standard, the plaintiff is required to demonstrate the subjective state of mind of the defendant before he will be *545 permitted to recover in libel (see St. Arman v Thompson, 390 US 727, 731). In the instant case, however, the plaintiff is a “private person” obliged to demonstrate only that defendant Forst “acted in a grossly irresponsible manner without due consideration for the [ordinary] standards” of sound journalism (Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199, supra). Inasmuch as this standard is capable of being met by wholly objective proof, without the need to resort to an exploration of the defendant’s subjective mental state, we see no reason to deprive the defendant of the ordinary remedy of summary judgment when an insufficient showing has been made in opposition to the motion. Indeed, we must not be reluctant to apply the ordinary rules governing summary judgment in libel cases such as this, since “[t]he threat of being put to the defense of a lawsuit * * * may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself” (Washington Post Co. v Keogh, 365 F2d 965, 968, cert den 385 US 1011; see Ingber, Defamation: A Conflict Between Reason and Decency, 65 Va L Rev 785, 833-834).
Ill
Having disposed of the issues involving the personal liability of the four individual defendants, we turn now to a consideration of the legal obligations of defendant News-day.[3] Initially, we note that we must decline plaintiff’s invitation to hold Newsday potentially liable by simple application of the doctrine of respondeat superior.[4] That common-law doctrine merely provides a theoretical means for *546 transferring the liability of an employee to his employer and imposing upon the latter financial responsibility for the legally cognizable culpable conduct of the former (see, generally, Prosser, Torts [4th ed], 69, pp 458-459). Given this principle, it is manifest that there can be no vicarious liability on the part of the employer if the employee himself is not liable, except perhaps in certain unusual circumstances not here present.
We have already determined that none of the four Newsday employees who were named as defendants in the instant action may be cast in damages for libel on the basis of their alleged participation in the republication of “The Heroin Trail” by NAL. It follows that the suit against Newsday cannot be maintained solely on the theory that it is vicariously liable, since there is no primary liability upon which such a claim of vicarious liability might rest. To be sure, Newsday might possibly have been answerable under the doctrine of respondeat superior had plaintiff commenced a timely action to recover for the allegedly tortious conduct of Newsday’s three reporters in. publishing the original series of articles. Inasmuch as the reporters’ liability for this publication was effectively extinguished when the Statute of Limitations on plaintiff’s cause of action in libel expired, however, any vicarious liability that Newsday might have had in consequence of its employees’ alleged misconduct must similarly be deemed extinguished. In short, given the posture in which this case is presented, Newsday may be found liable only if it is determined that it “acted in a grossly irresponsible manner” in its own right when it participated in the republication of “The Heroin Trail” in 1974.
Of course, it is difficult to conceive of a corporate entity such as Newsday “acting in a grossly irresponsible manner” in its own right, since a corporation is merely a legal fiction which can act and make decisions only through its employees and agents. Consequently, it may be theoretically tempting in this case simply to imput the “guilty knowledge” of the three reporters who allegedly fabricated their sources directly to their corporate employer for purposes of evaluating Newsday’s culpability, notwithstanding that there is *547 no legal liability on the part of the reporters which could be transferred to Newsday under traditional principles of respondeat superior. Indeed, were we to apply conventional principles of agency law to the facts in this case, we might well hold Newsday chargeable as principal with the purported knowledge of its agents, the reporters, that the published statements concerning plaintiff had not been verified by Labernas, Aygun and Erbug (see, generally, 3 NY Jur 2d, Agency, § 259). Under such an analysis, we could not dismiss the suit against Newsday upon the instant summary judgment motion, since that corporate entity would be deemed to have possessed the “guilty knowledge” of its employees when it participated in the 1974 republication of “The Heroin Trail” and might therefore be treated as liable for its own “grossly irresponsible” conduct in connection with the book.
We find such a simplistic analysis to be unacceptable in this context, however, for we believe that abstract legal concepts such as the imputation of knowledge or personal animus should be applied only with extreme caution in libel cases such as this, where liability may result only if there is a finding of actual fault on the part of the defendant (Gertz v Robert Welsh, Inc., 418 US 323, supra). We begin with the premise that the original publication of “The Heroin Trail” was a separate tort, which must be distinguished for purposes of analysis from Newsday’s subsequent decision to participate in the 1974 republishing venture. It may well be that the knowledge of Newsday’s reporters should be attributed to the corporation for purposes of assigning liability for the initial publication of the articles, since Newsday, as a corporate owner of a newspaper, is expected to bear the risks attendant upon that enterprise, including the risk of injuries to individual reputations which may be caused by the “grossly irresponsible” conduct of its reporters (see, e.g., Corrigan v Bobbs-Merrill Co., 228 NY 58). It is quite another matter, however, to impute the “guilty knowledge” of the reporters to their corporate employer when the employer embarks upon a business venture such as licensing a republication of the articles by a third party, a venture which is conceptually unrelated to its functions as a newspaper publisher. In such *548 situations, there is no sound reason, either in policy or in logic, to impute the knowledge of its reporters to the corporate entity; instead, it is the mental state of the corporate agents at the managerial level who participated in the decision to embark upon the separate business venture which is relevant for the purpose of assigning fault to the corporate entity. If such agents had knowledge or even notice that material to be republished was untrustworthy, it would be reasonable to impute their knowledge to the corporation and to impose liability upon the corporation for their careless conduct in licensing republication without further inquiry. If, on the other hand, the managerial staff of the newspaper acted in innocence and without any inkling of dishonesty on the part of the reporters, it is difficult to comprehend how the newspaper could be held “grossly irresponsible” solely on the basis of misconduct by reporters of which the management of the newspaper was unaware.
Indeed, in this context, the theory of imputed knowledge discussed above is really only a legalistic sleight of hand which operates to convert conduct that is actually blameless into conduct that may be considered culpable for purposes of assigning liability. In the law of agency, from which the concept of imputed knowledge is borrowed, we treat the principal as though he possessed all of the knowledge of his agent on the abstract assumption that the faithful agent will ordinarily perform his duties in a proper manner and will keep his principal informed of all matters pertinent to his business (see, e.g., Henry v Allen, 151 NY 1). We impute the knowledge of the agent to the principal, however, even where the underlying assumption is not borne out in reality, because we believe that the risks of the agent’s deceit should be shouldered by the principal who has employed him and cloaked him with authority to receive information. While these principles seem sound in the commercial setting, we think that a closer analysis must be applied before they are imported wholesale into the law of libel.
Since the decision of the Supreme Court in New York Times Co. v Sullivan (376 US 254, supra), courts have been required to balance society’s interest in protecting individual reputations against the strong public interest in *549 the free flow of information. In fact, judicial solicitude for this latter interest has led to the conclusion that the individual must occasionally bear the risk of injury to reputation arising from false and defamatory statements so that those who would disseminate facts and ideas are not unreasonably deterred (Gertz v Robert Welsh, Inc., 418 US 323, supra). Before we may impute the knowledge of the reporters in this case to their employer and thereby impose upon the employer the risk of its agents’ alleged dishonesty, we must determine whether the result would unduly impair the exercise of protected First Amendment rights.
Once again, our decision in this regard must be made with an eye toward the realities governing the operation of the institutional press. When the management of Newsday made the decision to permit NAL to republish “The Heroin Trail” in book form, it had no realistic choice but to assume that its carefully designed internal procedures for ensuring accuracy had been effective, at least in the absence of some fact “that would arouse the suspicions of a careful publisher or that would give cause for further inquiry” (James v Gannett Co., 40 NY2d 415, 424, supra). Indeed our standard of “gross irresponsibility” demands no more than that a publisher utilize methods of verification that are reasonably calculated to produce accurate copy (see Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, supra). Were we to premise liability for a corporate decision to permit republication of its articles solely upon the imputation of the reporters’ allegedly “guilty knowledge”, we would, in effect, be imposing upon the management of newspapers the intolerable burden of rechecking every reporter’s assertions and retracing every source before proceeding with such a decision. Inasmuch as such a rule would clearly pose an unacceptable barrier to the free flow of ideas, we are constrained to reject it. Instead, we conclude that the interest of society in protecting the reputation of individuals may be adequately served by a rule which imposes liability for a newspaper’s corporate decision to license republication only when it is shown that the corporate agents who participated in the decision “acted in a *550 grossly irresponsible manner” by ignoring or failing unreasonably to become aware of facts that would alert a careful publisher to refrain from acting without further inquiry.
Applying this standard to the instant case, we conclude that Newsday was entitled to have the cause of action against it dismissed upon its motion for summary judgment. The evidence offered by plaintiff in opposition to the motion consisted solely of affidavits which tended to indicate that the reporters who authored the story had acted improperly. Such evidence, however, is not sufficient to withstand a motion for summary judgment in a case such as this absent some indication that the corporate agents who made the decision to republish had reason to suspect the integrity of the reporters or the veracity of the statements they authored.
IV
Finally, we hold that the cause of action asserted against NAL, the book publisher, should also have been dismissed. This court held in Rinaldi v Holt, Rinehart & Winston (42 NY2d 369, 383), that a company or concern which simply republishes a work is entitled to place its reliance upon the research of the original publisher, absent a showing that the republisher “had, or should have had, substantial reasons to question the accuracy of the articles or the bona fides of [the] reporter”. Here, of course, no such showing was made. To the contrary, in view of the widespread acclaim that “The Heroin Trail” received and the absence of any prior litigation in connection with its first publication, it would appear that NAL was entirely justified in assuming without further inquiry that the series was accurate.
It is argued that the reasoning in Rinaldi, which involved a claim of libel by a public official, should not be applied in a case such as this, where the rights of a private individual are at stake. This contention is premised upon the difference in the standards that are applied to evaluate the conduct of the defendant when the plaintiff is a public official, as distinguished from a private individual (compare New York *551 Times Co. v Sullivan 376 US 254, supra, with Gertz v Robert Welsh, Inc., 418 US 323, supra). We conclude, however, that the difference in standards relied upon by plaintiff is not a sufficient ground for eliminating entirely the qualified privilege articulated in Rinaldi in all cases involving private plaintiffs.
The holding in Rinaldi stands for the proposition that a republisher is qualifiedly privileged to rely upon the research of the original publisher in making its own decision whether to reprint the material in question. The difference between the “actual malice” standard utilized in cases involving public officials and the “gross irresponsibility” standard utilized in cases involving private plaintiffs is relevant only in determining the degree of fault that must be established in order to defeat the privilege. The existence of the privilege, however, remains a constant, regardless of the status of the plaintiff against whom it is invoked. Thus, in Rinaldi, the existence of cqnsiderable controversy about the republished material was, as a matter of law, insufficient to defeat the qualified privilege possessed by the republisher under the “actual malice” standard that was applicable in that case. In contrast, in a case such as this involving the lesser “gross irresponsibility” standard, the existence of such controversy might well be sufficient to create a triable question of fact as to whether the defendant should be held liable, notwithstanding the otherwise privileged character of its conduct. Even under the less stringent “gross irresponsibility” standard, however, the existence of the privilege alone is enough to support a grant of summary judgment in favor of the defendant in the absence of some circumstance that would justify an inference of fault.
Here, plaintiff has failed to demonstrate the presence of such a circumstance. There is absolutely no evidence in the record that NAL had cause to doubt the veracity of the statements in question or the integrity of the reporters who gathered the underlying facts. Although plaintiff has agued that NAL’s activities should be deemed to be “tainted” because it is owned by the same parent corporation that owns Newsday, we cannot agree that the existence of this distant corporate relationship is, without more, an adequate ground *552 for defeating the republisher’s privilege. NAL is thus entitled to summary judgment upon its motion.
Accordingly, pursuant to the majority disposition herein, the order of the Appellate Division should be modified by reversing so much thereof as reinstated the causes of action against defendants Greene, Payne, Royce, Forst and the New American Library and by dismissing those causes of action, with costs to those defendants against plaintiff, and, as so modified, affirmed, with costs to plaintiff against defendant Newsday. The question certified should be answered in the negative.
OPINION OF THE COURT
Jones, J.
We are in agreement with the other members of the court that this action should be dismissed as to Greene, Payne and Royce, the three reporters, as to Forst, the managing editor, and as to the New American Library and accordingly concur in all but Part III of Judge Gabrielli’s opinion. We cannot, however, accept the analysis in Part III of that opinion by which the three Judges who join therein would dismiss the action against Newsday, Inc.
The proper analysis, in our view, begins with consideration of the liability to which Newsday, Inc., would have been subject in consequence of the initial publication of the series of newspaper articles had the bar of the Statute of Limitations not intervened. As stated in Judge Gabrielli’s opinion, the denials of Labernas, Aygun and Erbug that they had made any disparaging comments about plaintiff concerning his purported involvement in the international heroin trade to any of the three reporters on whose investigative activities the series was based constitute a showing of facts sufficient to have required a trial regarding the reporters’ allegedly “irresponsible” conduct with respect to the original publication of the material (at p 538). That the three reporters might be found to have “acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties” (Chapadeau v *553 Utica Observer-Dispatch, 38 NY2d 196, 199) would have exposed both the reporters individually and the corporation to possible liability to plaintiff. Any liability of the corporation, however, would not have stemmed from or in any way been dependent on the legal liability of the reporters as individuals; it would have been grounded in the actions of the employees, whatever legal liability for such actions the law might have imposed on the reporters individually. The actions of the reporter's as employees of the corporation acting within the scope of their employment would be deemed by the law to be the actions of the corporation, and the liability, if any, of the corporation would have been based on such corporate activities.
A corporation as a legal but inanimate entity acts through its corporate personnel. All liability of a corporation in defamation necessarily is based on the conduct of some corporate officer, employee or agent. So here the liability now asserted by plaintiff against Newsday arising out of the republication of the news series in pocketbook form is necessarily predicated on the actions of the three reporters (see Cantrell v Forest City Pub. Co., 419 US 245, 253). Any publication, whenever made, by the corporation must be judged in the light of all relevant corporate activity. If gross irresponsibility there were in the investigative stages, such fact would carry forward to all publication of material based thereon.
Liability of both corporation and reporters with respect to tne nrst publication is now foreclosed by the one-year Statute of Limitations. The reporters individually have no liability with respect to the second publication — of the pocketbook — because they had no part in it. In its answer Newsday, however, admitted that it had participated in the publication of the pocketbook, “The Heroin Trail”, and its counsel have never claimed otherwise. Its liability, if any there ultimately proves to be, will stem from that fact, accompained by its prior allegedly grossly irresponsible investigative actions. Its legal position, therefore, is precisely the same as if claims with respect to the publication of the newspaper series were not time-barred or as if there had *554 never been a newspaper series and the publication of the pocketbook were the first publication.
We are not dealing with concepts of vicarious liability or of secondary indemnification, but of direct corporate responsibility. We know of no authority in the law of defamation, and none is cited in Judge Gabrielli’s opinion, which has heretofore excused a corporation from liability for allegedly libelous publication on the ground that action with respect to that publication is barred against the individual participating corporate personnel.
Simply stated, the tender of evidentiary proof in admissible form submitted by plaintiff on Newsday’s motion for summary judgment is sufficient to require a trial with respect to the corporate liability of Newsday on the ground that Newsday acted in a grossly irresponsible manner in republishing material as to which the investigative activities of its corporate personnel may have been grossly irresponsible.
Accordingly, the order of the Appellate Division to the extent that it reinstated the causes of action against News-day should be affirmed.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler, Fuchsberg and Meyer concur with Judge Gabrielli in Parts I, II and IV of his opinion.
Judges Jasen, Jones, Fuchsberg and Meyer concur with Judge Jones, differing with Part III of the opinion by Judge Gabrielli.
Judge Gabrielli dissents in part and votes to reverse for the reasons stated in Part III of his opinion in which Chief Judge Cooke and Judge Wachtler also concur.
Order modified, with costs to defendants Greene, Payne, Royce, Forst and the New American Library against plaintiff, in accordance with the opinion by Judge Gabrielli and the opinion by Judge Jones, and, as so modified, affirmed, with costs to plaintiff against defendant Newsday. Question certified answered in the negative.

. Defendants declined to identify their other sources by name. Inasmuch as defendants have explicitly disclaimed any reliance upon the existence of their unnamed sources in the instant motion for summary judgment, however, we have no occasion to consider whether a claim that the information underlying a newspaper article was supplied by unidentified sources can ever support a grant of summary judgment in favor of the defendants in a libel action under the standard of “gross irresponsibility” delineated in Chapadeau v Utica Observer-Dispatch (38 NY2d 196, supra; cf. Herbert v Lando, 441 US 153).

. This is not to suggest that the three Newsday reporters could not have been found legally responsible for the republication had plaintiif been able to demonstrate that they participated in the original publication with knowledge or a reasonable expectation that republication was likely (see Campo v Paar, 18 AD2d 364, 367-368; see, generally, Bassell v Elmore, 48 NY 561; Restatement, Torts 2d, § 576, subd [c] ).

. The views expressed in Part III of this opinion concerning the liability of defendant Newsday are shared by Chief Judge Cooke, Judge Gabbielli and Judge Wachtleb. Judges Jasen, Fuchsbebg and Meyeb concur in the separate majority opinion on this point authored by Judge Jones.

. In support of his contention that a newspaper may be held answerable in libel for the tortious conduct of its reporters, plaintiff relies exclusively upon the decision of the Supreme Court in Cantrell v Forest City Pub. Co. (419 US 245, 253). While we have no present quarrel with this general proposition, we think it necessary to point out that Cantrell is not supportive of plaintiff’s position, since in that case the defendant did not object to the trial court’s jury instruction that liability could be based on the theory of respondeat superior and the Supreme Court therefore had no occasion to consider the propriety of the instruction (id., at pp 253-254, n 6).